

**FILED**
6/12/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

25-cr-321
Judge Sharon Johnson Coleman
Magistrate Judge Daniel P Mclaughlin
RANDOM CAT 3

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANOSH AHMED,<br>MOHAMED SIRAJUDEEN,<br>  aka "SIRAJ,"<br>MAHMOOD SAMI KHAN,<br>  aka "SAMI," and<br>SUHAIB AHMAD CHAUDHRY | Violations: Title 18, United States Code, Sections 371, 1343, 1956(a)(1)(B)(i), and 1956(h), and Title 42, United States Code, Sections 1320a-7b(b)(1)(B) and 1320d-6(a)(2) and (b)(3)<br><br>**Indictment**<br><br>**UNDER SEAL** |

## COUNTS ONE THROUGH FOURTEEN

The SPECIAL JUNE 2024 GRAND JURY charges:

1.      At times material to this indictment:

*Covid-19 Outbreak and Testing*

a.      In or around December 2019, severe acute respiratory syndrome coronavirus 2, the virus that causes coronavirus disease ("Covid-19"), began to spread throughout the world.

b.      Various tests to detect for Covid-19 were developed, including testing known as polymerase chain reaction tests ("PCR tests") performed in a clinical laboratory and interpreted by trained laboratory personnel, tests known as "antigen tests" or "rapid tests" that delivered results within approximately 15 minutes, and "antibody tests" to determine whether an individual had previously contracted Covid-19.

c.     Individuals sought testing for Covid-19 testing for a variety of reasons, including for diagnosis when suffering from Covid-19 symptoms, and in advance of engaging in certain activities, like airplane travel and planned contact with others who, due to age or health conditions, were at higher risk of death or severe illness from Covid-19. Some individuals who were tested used their test results to help determine whether or not to engage in future activities, such as travel or contact with others. Individuals often needed their test results within a short period of time before engaging in such activities.

*The HRSA Program for Reimbursement of Covid-19 Tests*

d.     Between March 2020 and March 2021, multiple federal laws were enacted that provided funding to be administered by the U.S. Department of Health and Human Services ("HHS"), for reimbursement to hospitals and other health care providers for Covid-19 testing and other related services for uninsured individuals.

e.     The legislation defined an uninsured individual as someone who was not enrolled in: (a) a Federal health care program (e.g., Medicare or Medicaid), including an individual who was eligible for medical assistance by reason of and during any portion of the Covid-19 emergency period; (b) a group health plan or health insurance coverage offered by a health insurance issuer in the group or individual market; or (c) the Federal Employees Health Benefits Program.

f.     The Health Resources and Services Administration ("HRSA") was an agency of HHS, which oversaw and administered the funds provided by the described legislation. HRSA established a single electronic claims processing system

2

for health care providers to submit claims for reimbursement for diagnostic testing and treating uninsured individuals from the funds ("the HRSA Program").

      g.    To participate in the HRSA Program, an individual authorized to attest on behalf of a health care provider (the "attester") was required to attest to compliance with the Terms and Conditions for Participation in the HRSA Program ("HRSA Program Terms and Conditions"). Providers were required to acknowledge that each time they submitted a claim for reimbursement for Covid-19 testing and/or testing-related items and services provided to individuals who did not have health coverage at the time the services were provided ("uninsured individuals"), the claim was required to be in full compliance with the HRSA Program Terms and Conditions.

      h.    Providers were required to make certifications regarding the HRSA Program Terms and Conditions that included, but were not limited to the following:

      i.    The provider or its agents provided the items and services on the claim form to the uninsured individuals identified, on or after February 4, 2020, and all items and services for which payment was sought were medically necessary;

      ii.    To the best of the attester's knowledge, the patients identified on the claim form were uninsured individuals at the time the service was provided; and

iii.     The provider would maintain appropriate records and documentation required to substantiate the claims, and would promptly submit copies of such records and documentation upon request of appropriate regulators.

i.     To claim reimbursement for Covid-19 testing of uninsured individuals, providers were required to submit patient rosters to the HRSA Program's web portal, either on an individual patient basis or in batches. To document patient eligibility, providers were required to submit unique identifiable information about each uninsured individual, including the patient's name, date of birth, and gender. The HRSA Program further required the patient's social security number and state of residence, or state identification or driver's license, to verify patient eligibility. If a patient's social security number, state of residence, or state identification or driver's license was not submitted, the attester was required to attest that they attempted to capture this information before submitting a claim and the patient did not have this information at the time of service, or that the attester did not have direct contact with the patient and thus did not have an opportunity to attempt to capture this information. HRSA would assign a claim number for each eligible test based on these submissions, with the claim number subsequently submitted as a prerequisite for reimbursement.

j.     Each time a provider added either an individual patient or a batch of patients to their patient roster, they were required to attest to the following, among other things:

4

i.      They had read and agreed to the applicable HRSA Program Terms and Conditions;

ii.     They had checked for health care coverage eligibility and confirmed the patient was uninsured, and no other payer would reimburse for Covid-19 testing or care for the patient;

iii.    They would accept the defined program reimbursement, as determined by HRSA, as payment in full and will not balance bill the patient;

iv.     They had agreed to program terms and conditions and to be subject to post-reimbursement audit review; and

v.      The information submitted was true and complete to the best of their knowledge.

k.      Providers sought reimbursement from HRSA through claims that were submitted electronically to HRSA. HRSA paid claims by electronically transmitting funds to the bank account indicated in the submitter's HRSA account.

l.      HRSA generally reimbursed laboratories for Covid-19 tests at Medicare rates described as follows:

i.      HRSA reimbursed laboratories for performing PCR Covid-19 tests and collecting specimens for those tests. PCR Covid-19 tests were performed on specimens which were collected at collection sites and then sent to a laboratory for processing through a specific lab machine, and lab personnel interpreted if the patient specimens were positive or negative for Covid-19. Typically, specimens were sent to a laboratory along with a corresponding requisition form, that is, a form filled

out at collection sites with patient identifying information corresponding to the specimen. HRSA reimbursed labs for PCR Covid-19 tests at a rate of $75, with a potential additional reimbursement of $25 if the laboratory returned results to patients within 48 hours, for a total of up to $100 per test, plus a fee of $23.46 for the collector for collecting the sample, which was billed under a separate code;

        ii.      HRSA reimbursed laboratories for antigen Covid-19 tests, also known as rapid tests, which were conducted at collection sites and other health care sites, at a rate of up to $41.38;

        iii.     HRSA reimbursed laboratories for antibody Covid-19 tests, which were conducted at collection sites and other health care sites or sent to a laboratory, at a rate of $42.13; and

        iv.     HRSA did not reimburse for at-home Covid-19 tests. Medicare first covered at-home Covid-19 tests on or about April 4, 2022, after the HRSA Program ended, at a rate of $12.00 per test.

        m.     On or about March 15, 2022, HRSA notified providers that, due to a lack of sufficient funds, the HRSA Program would stop accepting claims for Covid-19 testing and treatment on March 22, 2022.

*IDPH Reporting Requirements Related to Covid-19 tests*

        n.     The Illinois Department of Public Health ("IDPH") required Illinois laboratories to report to IDPH the results of any Covid-19 test conducted on an Illinois resident, regardless of whether the result was positive or negative.

*Entities and Individuals Involved*

o.     Hospital A was a small hospital located on the west side of Chicago, Illinois.  Hospital A had agreements to provide Covid-19 testing to the Cook County Jail, the Cook County Sheriff's Office, and the Cook County Juvenile Detention Center in 2020, 2021 and 2022. In addition, starting in 2021 and continuing through 2022, Hospital A provided Covid-19 vaccines at different sites in and around the Chicago area, and also conducted Covid-19 testing at some of those sites. Hospital A submitted the biological samples it collected for Covid-19 testing to either Lab B, a laboratory used by Hospital A prior to the pandemic, or the IDPH. Hospital A never had any agreement to submit, and never submitted, to OCL any biological samples or patient information for purposes of Covid-19 testing or for any other purpose.  Hospital A never collected biological samples for Covid-19 testing outside the State of Illinois.

p.     Defendant ANOSH AHMED ("AHMED") was a medical doctor who was hired by Hospital A in or around November 2017, while still in his medical residency.  In or around December 2017, AHMED obtained his medical license, and from in or around December 2017 until on or about March 26, 2021, AHMED served as Hospital A's Chief Operating Officer (COO). Starting in or around July 2018 until on or about March 26, 2021, AHMED also served as the hospital's Chief Financial Officer (CFO). After AHMED left Hospital A on or about March 26, 2021, he had no authority to act on behalf of Hospital A, and he had no official affiliation with or official duties for Hospital A.

7

q. AHMED owned and operated the following entities: (1) Global Healthcare Consulting Group LLC ("Global Healthcare") since in or around 2018; (2) Westside Pharmacy, LLC ("Westside Pharmacy"), which did not have an active pharmacy license in Illinois or an active pharmacy business, since in or around 2018; and (3) Anosh, Inc. since no later than on or about August 27, 2020. AHMED also controlled various clinical laboratories in Texas that were not operational for Covid-19 testing during the HRSA Program, namely Summer Diagnostic Labs, Apollo Labs, SoftLand Labs, Artemis Labs, and Helios Labs ("AHMED's Non-Operational Texas Labs"), each of which was nominally owned by others, from approximately in or around November 2021 through at least late 2023. AHMED maintained bank accounts at Bank A, Bank B, and Bank C in his name and in the names of entities he controlled.

r. O'Hare Clinical Lab Services, Inc. ("OCL"), was a clinical laboratory located in Chicago, Illinois, incorporated in or around 2006. OCL was operated and managed by Sirajudeen, but nominally owned by Individual G. Prior to the Covid-19 pandemic, OCL was a small lab located in an office building in suburban Chicago that provided clinical tests for nursing homes and assisted-living centers near Chicago. During the pandemic, OCL claimed to have performed extensive Covid-19 testing for the uninsured. HRSA ceased paying OCL claims for Covid-19 testing in or around September 2021 after discovering that Individual G had a felony conviction. OCL maintained bank accounts at Bank A and Bank E.

8

s.　　Mohamed Sirajudeen aka "Siraj" owned and operated Chicago Polyclinic, LLC ("Chicago Polyclinic"), a management company located in Chicago, Illinois, that maintained bank accounts at Bank E and Bank G. On or about September 15, 2020, OCL entered into a "Laboratory Management Services Agreement" for Chicago Polyclinic to provide management and administrative support services to OCL. Sirajudeen was responsible for overseeing the processing and submission of all testing, including Covid-19 testing, at OCL in 2021, until HRSA ceased reimbursing OCL for Covid-19 testing in or around September 2021. From in or around January 2022 through in or around March 2022, Sirajudeen invested in Lab A, a clinical laboratory located in Texas that submitted Covid-19 testing claims to HRSA. Sirajudeen maintained bank accounts individually at Bank A.

t.　　Defendant MAHMOOD SAMI KHAN ("KHAN") was employed by Anosh, Inc. as Director of Operations, since at least in or around 2021. KHAN also was the owner/director of clinical laboratories, including two of AHMED's Non-Operational Texas Labs, Apollo Labs and Artemis Labs, from on or about December 1, 2021, to at least June 2022.

u.　　Suhaib Ahmad Chaudhry ("Chaudhry") was employed by Anosh, Inc., as Director of Information Technology since at least in or around 2021. Chaudhry also was the owner/director of clinical laboratories, including two of AHMED's Non-Operational Texas Labs, SoftLand Labs and Helios Labs, from on or about December 1, 2021 to at least June 2022.

v. Individual A resided and worked in the Northern District of Illinois. Individual A was an independent contractor hired by AHMED to perform data entry of, and submit to clinical laboratories, including OCL, Lab A and at least some of AHMED's Non-Operational Texas Labs, patient identifiers for the purpose of billing Covid-19 testing to HRSA.

w. Individual B resided and worked in the Northern District of Illinois. Individual B was a former employee of Hospital A who was hired by AHMED and Sirajudeen to conduct billing for Lab A, and was hired by AHMED to conduct billing for AHMED's Non-Operational Texas Labs, specifically to submit claims to the HRSA Program for reimbursement for Covid-19 testing of the uninsured.

x. Individual C resided and worked in the Northern District of Illinois. Individual C was the contractor responsible for submitting claims to HRSA for Covid-19 testing on behalf of OCL. Individual C's billing duties included reconciling the billing data with the laboratory testing data.

y. Individual D was the owner of Lab A.

z. Individual E was a restaurant and bar owner in Texas who was an associate of AHMED.

aa. Individual F was employed as an executive at Hospital A until on or about April 12, 2022. Individual F's responsibilities at Hospital A included handling all aspects of vendor invoices and bills and payments to vendors. Beginning in 2020 and continuing through in or around March 2022, Individual F also had certain duties with regard to Hospital A conducting Covid-19 testing, including off-

site testing, and administering Covid-19 vaccines. No later than January 2022, Individual F became an employee or contractor of Anosh, Inc., where Individual F's responsibilities included management roles, including Chief Medical Officer for AHMED's Non-Operational Texas Labs.

2.    Beginning in or around April 2021 and continuing to at least in or around June 2022, in the Northern District of Illinois, Eastern Division and elsewhere,

ANOSH AHMED and<br>MAHMOOD SAMI KHAN,

defendants herein, along with Mohamed Sirajudeen ("Siraj") and others known and unknown to the Grand Jury, knowingly devised, intended to devise, and participated in a scheme to defraud, and to obtain money and property owned by and under the custody and control of HRSA, by means of materially false and fraudulent pretenses, representations and promises, as further described below.

3.    It was part of the scheme that AHMED, Sirajudeen, and KHAN, for the purpose of obtaining government funds, caused clinical laboratories, including OCL, Lab A, Summer Diagnostic Labs, Apollo Labs, SoftLand Labs, Artemis Labs, and Helios Labs to prepare and submit false claims to HRSA seeking reimbursement for Covid-19 testing of specimens purportedly collected from uninsured individuals, knowing that such testing had not occurred. The false claims sought reimbursement in the amount of approximately $894,520,064, resulting in payments for such false claims in the amount of approximately $293,221,468.

11

*Collection of Patient Data*

4.      It was further part of the scheme that, in or around April 2021, after AHMED had left Hospital A but while Individual F was still employed there, AHMED obtained from Individual F a spreadsheet containing personal identifiers for patients of Hospital A, including names, dates of birth, gender and addresses, collected from more than 150,000 patient visits between July 2014 and June 2020 at Hospital A.

5.      It was further part of the scheme that, from in or around April 2021 through March 2022, AHMED, KHAN, Chaudhry and others obtained and caused others to obtain personal identifiers for purported patients in various ways, to be used for Covid-19 testing claims, including by:

        a.      Collecting such information from individuals who provided it when ordering Covid-19 antigen at-home test kits from an internet site run by KHAN;

        b.      Collecting such information from individuals who provided it in return for receiving a free Covid-19 antigen test; and

        c.      Collecting such information from individuals who provided it for the purpose of receiving further information about Covid-19.

6.      It was further part of the scheme that, using collected patient identifiers, AHMED, KHAN, Chaudhry and others caused fraudulent claims for Covid-19 testing to be submitted to HRSA from OCL, Lab A, and AHMED's Non-Operational Texas Labs.

12

*O'Hare Clinical Labs ("OCL")*

7.     It was further part of the scheme that, starting in or around June 2021, AHMED falsely represented to OCL and others that AHMED was collecting biological samples for Covid-19 testing and performing antigen tests on behalf of Hospital A at various collection sites around the country, knowing that he was no longer affiliated with Hospital A, in order to make the purported testing appear legitimate, to cause OCL to submit claims to HRSA for reimbursement, and to convince Sirajudeen to pay a higher collection fee to AHMED in anticipation of a high volume of Covid-19 testing claims generated from Hospital A.

8.     It was further part of the scheme that, on or about June 4, 2021, Sirajudeen, as the manager of OCL, and AHMED, on behalf of Westside Pharmacy, entered into an agreement wherein Westside Pharmacy would submit to OCL biological specimens purportedly collected at Hospital A collection sites and sent to OCL for PCR and/or antigen tests, and OCL would submit claims for such tests to the HRSA Program for reimbursement. Pursuant to this agreement, OCL agreed to pay Westside Pharmacy a set fee for every specimen that Westside Pharmacy sent to OCL for processing, specifically a collector fee of $23.46 plus a management fee of $14.04 for each specimen collected, plus $6.00 per specimen for each antigen test and $6.00 per specimen for each antibody test on the same specimen, for a total fee to be paid by OCL to Westside Pharmacy of up to $49.50 per specimen.

9.     It was further part of the scheme that, in or around June 2021, AHMED and Sirajudeen changed the payment terms of the agreement described above to

provide for higher payments to AHMED in exchange for each testing specimen, and concealed the changes by not amending the written agreement.

10.     It was further part of the scheme that, on or about June 5, 2021, Individual F caused Hospital A to create a new email address at Hospital A, using Hospital A's domain name, solely for OCL to email to Hospital A Covid-19 test results for purported patients who had provided test specimens at AHMED's purported Hospital A collection sites, to create the false appearance that AHMED was working on behalf of Hospital A, and that Hospital A would report those results to patients.

11.     It was further part of the scheme that, in or around June 2021, AHMED hired Individual A to engage in data entry to provide to OCL identifiers of purported uninsured individuals who submitted biological specimens for Covid-19 testing at various purported collection sites of Hospital A, and to submit those identifiers to OCL through various electronic means, including email and Google Sheets, rather than submitting such information in requisition forms provided together with actual biological specimens for Covid-19 testing.

12.     It was further part of the scheme that AHMED, and others known and unknown, caused Hospital A patient identifiers provided by Individual F to be scrambled and submitted through Individual A to OCL as identifiers of uninsured individuals who purportedly submitted biological samples for Covid-19 testing at collection sites controlled by AHMED.

13.     It was further part of the scheme that AHMED and Sirajudeen caused OCL to submit claims to HRSA for reimbursement for each purported patient for:

14

(a) PCR testing and, sometimes, antigen and/or antibody testing; (b) collection of a biological sample; and (c) a premium for turning around results to patients within 48 hours.

14.     It was further part of the scheme that, from on or about June 4, 2021 to September 10, 2021, AHMED and others submitted and caused to be submitted to OCL patient data in support of approximately 1,360,024 claims for purported Covid-19 testing of uninsured individuals, and caused OCL to bill approximately $642,070,245 to HRSA and obtain approximately $201,772,694 from HRSA attributable to those claims.

15.     It was further part of the scheme that AHMED submitted and caused to be submitted to OCL identifiers for more than approximately one million purported patients, representing falsely that such patient identifiers were associated with uninsured individuals who had submitted biological samples for Covid-19 testing, knowing that the purported patients had not submitted biological samples.

16.     It was further part of the scheme that, in or around June 2021, AHMED made and caused others, including Individual F, to make multiple false and misleading statements, including to OCL, the Illinois Department of Public Health, Individual A, and others, for the purpose of facilitating the scheme, to conceal the scheme, and to justify the voluminous number of Covid-19 samples that AHMED claimed to collect for billing to the HRSA Program, including that:

        a.      The biological samples for Covid-19 testing were purportedly collected from uninsured individuals at sites affiliated with Hospital A;

     b.    AHMED operated collection sites in 2021 for Hospital A in the Chicago area;

     c.    AHMED was involved in test collection at Hospital A's actual Covid-19 vaccination and testing sites;

     d.    AHMED operated collection sites for Hospital A for Covid-19 testing during 2021 in locations outside of Chicago, including in Illinois, Florida, Louisiana, Missouri and Texas;

     e.    The high volume of Covid-19 testing attributable to and purportedly being conducted through Hospital A, a small community hospital, at a time when most health care facilities were reducing Covid-19 testing, was due to expanded outreach coordinated by Individual F on behalf of Hospital A, purportedly focusing on African Americans, Hispanic individuals, and the undocumented community; and

     f.    After IDPH raised concerns over the volume of testing claimed to be conducted in affiliation with Hospital A, AHMED and Sirajudeen instructed, and caused others at OCL not to report any Covid-19 test results to IDPH, falsely representing to OCL staff that Hospital A would provide the test results to IDPH, to conceal from IDPH the high level of Covid-19 testing purportedly being performed by OCL and to avoid IDPH from questioning OCL's purported testing volume.

17.    It was further part of the scheme that Sirajudeen caused OCL to submit claims to HRSA from the patient lists AHMED submitted and caused to be submitted

16

to OCL instead of the laboratory testing data, knowing that OCL had not performed testing associated with those patient lists.

18.     It was further part of the scheme that, to conceal the fraudulent claims, Sirajudeen caused Individual C not to reconcile the billing data with the laboratory testing data for claims from AHMED's collection sites.

19.     It was further part of the scheme that, from on or about June 4, 2021 to on or about September 10, 2021, of the approximately $201,772,694 that HRSA paid to OCL for claims of Covid-19 testing from AHMED's purported collection sites, OCL and Chicago Polyclinic paid AHMED's entities approximately $147,091,992.

20.     It was further part of the scheme that, in or around September 2021, after HRSA disqualified OCL from submitting claims to HRSA due to the felony conviction of Individual G, the OCL nominee owner, AHMED and Sirajudeen took steps to continue the scheme by, among other things, attempting to install Individual B, a biller, as a new nominal owner of OCL, but they were unsuccessful.

*Ahmed's Non-Operational Texas Laboratories*

21.     It was further part of the scheme that, starting in or around November 2021, AHMED purchased and established, and managed, and caused KHAN and Chaudhry to purchase, establish, and manage, clinical laboratories in Texas, including: (a)  Summer Diagnostic Labs; (b)  Apollo Labs; (c) SoftLand Labs; (d)  Artemis Labs; and (e) Helios Labs.

*Summer Diagnostic Labs*

22.     It was further part of the scheme that, on or about October 21, 2021, AHMED, on behalf of Global Healthcare, entered into a Stock Purchase Agreement to purchase 100% of the stock of Summer Diagnostic, LLC from the then-owner of the laboratory ("Summer Diagnostic Labs"), and further took control of Summer Diagnostic Labs as follows:

    a.      On or about October 22, 2021, AHMED and KHAN caused to be submitted and submitted to the Texas Secretary of State a Statement of Change of Registered Office/Agent of Summer Diagnostic, changing the Registered Agent to KHAN;

    b.      On or about November 10, 2021, AHMED and KHAN filed and caused to be filed an amended Clinical Laboratory Improvements Act ("CLIA") Certification with the Center for Medicare and Medicaid Services ("CMS"), an agency of HHS, identifying AHMED as the owner and manager of Summer Diagnostic Labs;

    c.      On about December 1, 2021, AHMED, KHAN and Chaudhry opened an account at Bank C ending in 7917 in the name of Summer Diagnostic, LLC, with all three as signatories; and

    d.      On or about April 4, 2022, AHMED and KHAN added and caused to be added KHAN as an authorized signatory in addition to the former laboratory owner, on Bank A account ending in 9271 in the name of Summer Diagnostic Labs ("Summer Diagnostic Bank Account 9271"), and identified KHAN as the Manager of the LLC.

*Apollo Labs*

23.    It was further part of the scheme that on or about November 11, 2021, AHMED and KHAN filed and caused to be filed a Certificate of Formation with the Secretary of State of Texas registering Apollo Labs LLC, and identifying KHAN as the Registered Agent, Manager and Organizer, and further established Apollo Labs as follows:

a.    On or about November 22, 2021, AHMED and KHAN filed and caused to be filed a CLIA Certificate for Apollo Labs with the CMS, with an anticipated start date for the lab of December 1, 2021, identifying KHAN as the owner and director of the lab; and

b.    On or about March 24, 2022, AHMED and KHAN opened and caused to be opened Bank A account ending in 8127 in the name of Apollo Labs, LLC with KHAN as the sole signatory, and identifying KHAN as a member of the LLC.

*SoftLand Labs*

24.    It was further part of the scheme that on or about November 11, 2021, AHMED and Chaudhry filed and caused to be filed a Certificate of Formation with the Secretary of State of Texas for SoftLand Labs LLC, identifying Chaudhry as the Registered Agent, Manager and Organizer, and further established SoftLand Labs as follows:

a.    On or about November 22, 2021, AHMED and Chaudhry filed and caused to be filed a CLIA Certificate for SoftLand Labs with the CMS, with an

anticipated start date of December 1, 2021, identifying Chaudhry as the owner and director of the lab; and

b.      On or about March 23, 2022, AHMED and Chaudhry opened and caused to be opened Bank A account ending in 6385 in the name of SoftLand Labs, LLC with Chaudhry as the sole signatory, identifying himself as a member of the LLC.

*Artemis Labs*

25.      It was further part of the scheme that on or about November 19, 2021, AHMED and Chaudhry filed and caused to be filed a Certificate of Formation with the Secretary of State of Texas for Artemis Labs LLC, identifying Chaudhry as the Registered Agent, Manager and Organizer, and further established Artemis Labs as follows:

a.      On or about November 29, 2021, AHMED and KHAN filed and caused to be filed a CLIA Certificate for Artemis Labs with the CMS, with an anticipated start date of December 1, 2021, identifying KHAN as the owner and director of the lab.

b.      On or about November 30, 2021, Chaudhry and KHAN opened and caused to be opened Bank C account ending in 1780 in the name of Artemis Labs, LLC with Chaudhry and KHAN as the signatories.

c.      On or about March 23, 2022, Chaudhry opened and caused to be opened Bank A account ending in 7507 in the name of Artemis Labs, LLC with Chaudhry as the sole signatory.

*Helios Labs*

26.     It was further part of the scheme that on or about November 19, 2021, AHMED and Chaudhry filed and caused to be filed a Certificate of Formation with the Secretary of State of Texas for Helios Labs LLC, identifying Chaudhry as the Registered Agent, Manager and Organizer, and further established Helios Labs as follows:

a.     On or about December 6, 2021, AHMED and Chaudhry filed and caused to be filed a CLIA Certificate for Helios Labs with the CMS, with an anticipated start date of December 15, 2021, identifying Chaudhry as the owner and director of the lab.

b.     On or about November 30, 2021, AHMED, Chaudhry and KHAN opened and caused to be opened an account at Bank C ending in 6245 in the name of Helios Labs, LLC with AHMED, Chaudhry and KHAN as signatories.

c.     On or about March 23, 2022, Chaudhry opened and caused to be opened an account at Bank A ending in 8771, in the name of Helios Labs, LLC with Chaudhry as the sole signatory, identifying himself as a member of the LLC.

27.     It was further part of the scheme that AHMED installed Individual B, who worked remotely from the Northern District of Illinois, as the biller for Summer Diagnostic Labs, Apollo Labs, SoftLand Labs, Artemis Labs and Helios Labs, whose sole function was to submit claims for Covid-19 testing to HRSA.

28.     It was further part of the scheme that AHMED installed Individual F in a position of authority at AHMED's Non-Operational Texas Labs, and that her duties included approving the purchase of laboratory equipment.

29.     It was further part of the scheme that, despite none of AHMED's Non-Operational Texas Labs conducting Covid-19 tests on biological samples collected from individuals, AHMED, KHAN, and others known and unknown, submitted and caused to be submitted through Summer Diagnostic, Apollo Labs and SoftLand Labs, approximately 465,939 false claims to HRSA for Covid-19 testing, billed HRSA approximately $227,443,166 for such false claims, and obtained reimbursement in HRSA funds for those false claims in a total amount of approximately $83,359,131, specifically as follows:

    a.     From on or about November 10, 2021 through on or about March 22, 2022, AHMED and KHAN caused Summer Diagnostic Labs to submit to HRSA approximately 381,000 false claims for PCR and antigen Covid-19 testing of 381,642 uninsured individuals purportedly occurring from on or about March 7, 2021 through on or about December 24, 2021, including false claims for PCR and antigen testing of individuals whose identifiers were collected through: (i) the door-to-door and other public distribution of Covid-19 antigen test kits as described above; and (ii) individuals purchasing Covid-19 antigen test kits from an internet site run by KHAN, even though such individuals had not submitted a biological sample or provided insurance information; billed HRSA $186,073,803 for such false tests; and

obtained HRSA funds for such false claims in the amount of approximately $62,973,242.38;

b.      From on or about March 23, 2022 through on or about March 24, 2022, AHMED and KHAN caused Apollo Labs to submit to HRSA approximately 44,922 false claims for PCR and antigen Covid-19 tests purportedly occurring from on or about January 3, 2022 through on or about February 20, 2022, when Apollo Labs conducted no testing during that time, billing HRSA $21,880,158 for such false tests, and obtaining HRSA funds for such false claims in the amount of approximately $7,134,961.26;

c.      From on or about March 9, 2022 through on or about March 25, 2022, AHMED and others known and unknown caused SoftLand Labs to submit to HRSA approximately 40,017 false claims for PCR and antigen Covid-19 tests purportedly occurring from on or about December 14, 2021 through on or about February 23, 2022, when SoftLand Labs conducted no testing during that time, billing HRSA $19,489,205 for such false tests, and obtaining HRSA reimbursement funds for such false claims in the amount of approximately $13,250,928.15.

30.     It was further part of the scheme that, for the purpose of submitting additional false claims for PCR and antigen Covid-19 testing of uninsured individuals, on or about March 17, 2022, AHMED and KHAN caused Artemis Labs to submit to HRSA approximately 22,700 sets of patient identifiers to obtain claim numbers, but HRSA did not issue claim numbers in a timely manner for Artemis to submit the final claims.

31.     It was further part of the scheme that AHMED, KHAN, and others filed and caused to be filed claims with HRSA through AHMED's Non-Operational Texas Labs, as described above, for tests that AHMED's Non-Operational Texas Labs could not and did not run.

*Lab A*

32.     It was further part of the scheme that, beginning in or around December 2021, Sirajudeen told Individual D, the owner of Lab A, that Sirajudeen was planning to purchase Lab A, a working lab in Texas, and began funding lab expenses, including Covid-19 testing machines and supplies at Lab A, so that Lab A could run PCR Covid-19 tests for which Lab A would receive reimbursement from HRSA.

33.     It was further part of the scheme that, in or around late December 2021, AHMED and Sirajudeen told Individual D and others that AHMED was going to buy Lab A, but, to conceal AHMED's control of Lab A, AHMED began causing the documentation relating to the ownership of Lab A to be changed to the name of KHAN and Individual F.

34.     It was further part of the scheme that AHMED installed Individual B, who worked remotely from the Northern District of Illinois, as the biller at Lab A and provided to Individual B patient identifiers for the purpose of causing Lab A to submit false claims to HRSA for Covid-19 testing.

35.     It was further part of the scheme that AHMED told Individual D that Individual F was going to be named the owner of Lab A, and directed Individual B to assist in changing the ownership to Individual F's name and, under the pretense of

intending to purchase Lab A, AHMED instructed Individual D to give Individual F and KHAN access to Lab A and its testing and billing operations.

36. It was further part of the scheme that, from on or about March 2, 2022 through on or about March 25, 2022, AHMED and KHAN caused Lab A to submit to HRSA approximately 51,340 false claims for PCR and antigen Covid-19 tests purportedly occurring from on or about November 17, 2021 through on or about March 15, 2022, billed HRSA approximately $25,006,173 for such false claims, and obtained HRSA funds for such false claims in the amount of approximately $8,089,643.

37. It was further part of the scheme that AHMED concealed the false Covid-19 testing claims submitted to HRSA through Lab A by refusing, and causing Individual B to refuse, to disclose the HRSA billing to Individual D or other employees of Lab A, despite requests for such billing, and by thwarting Individual D's access to the HRSA billing account for Lab A.

*Concealment of the Scheme*

38. It was further part of the scheme that AHMED, Sirajudeen, and KHAN misrepresented, concealed, and hid, and caused to be misrepresented, concealed and hidden, the existence, purpose, and acts done in furtherance of scheme, including through doing and causing the following acts in addition to those described above:

a. On or about July 20, 2021, AHMED, having previously opened an account ending in 2567 at Bank B in the name of Westside Pharmacy, opened three additional bank accounts at Bank B under the name of Westside Pharmacy, but using

the name and address of Sirajudeen's entity, Chicago Polyclinic, as if Westside Pharmacy did business under that name ("AHMED's Chicago Polyclinic DBAs"), as follows: (1) account ending in 9129 in the name of Westside Pharmacy LLC d/b/a Chicago Polyclinic Operations 1; (2) account ending in 9161 in the name of Westside Pharmacy LLC d/b/a/ Chicago Polyclinic Operations 2; and (3) account ending in 9190 in the name of Westside Pharmacy LLC d/b/a Chicago Polyclinic Operations 3, with AHMED as the sole signatory for all three accounts. AHMED directed Sirajudeen, and Sirajudeen agreed, to pay proceeds of the scheme to Chicago Polyclinic Operations 1, Chicago Polyclinic Operations 2, and Chicago Polyclinic Operations 3, consistent with the name used in the three accounts for AHMED's Chicago Polyclinic DBAs, in an attempt to create the false appearance that movement of the HRSA funds from OCL or Sirajudeen's Chicago Polyclinic to those entities were intracompany transfers.

b.      Sometime after June 2021, AHMED and Sirajudeen created and caused to be created false and backdated invoices, each dated prior to June 2021, for goods and services provided by AHMED entities Westside Pharmacy and Global Healthcare Consulting to OCL and Chicago Polyclinic to make it appear that the payments from OCL and Chicago Polyclinic to AHMED were payments for the goods and services reflected on the false and backdated invoices.

c.      Sometime after June 2021, AHMED created four false and backdated documents, each titled "Management Contract Statement" and each backdated to June 2021, reflecting fees purportedly owed by OCL to AHMED's

Chicago Polyclinic DBAs, for various consulting services, including patient data processing and management services for the months of November 2020 and May 2021.

      d.    AHMED minimized and concealed his role in causing OCL to submit false claims to HRSA by creating a false agreement for management of OCL by an entity owned by Individual E, backdated to June 10, 2021, to make it appear that Individual E was responsible for the lab operations and the false HRSA claims submitted through OCL.

      e.    AHMED ordered co-schemers and others whom AHMED communicated with, directly or indirectly, to communicate using only encrypted messaging apps, to replace phones, and to destroy communications and other documents relating to the scheme.

      f.    In or around May 2022, AHMED and Sirajudeen created a false promissory note dated October 1, 2021, for a purported loan from Sirajudeen to AHMED for $14,000,000, and further created a false "Additional Security Note" which purportedly was executed in October 2021, which AHMED filed, along with a false affidavit, with the Cook County (Illinois) Recorder of Deeds on or about May 10, 2022 as a security lien on a property owned by AHMED, to disguise the wire fraud proceeds, kickbacks and bribes paid to AHMED by OCL and Chicago Polyclinic as loan proceeds that AHMED was obligated to repay, when in fact they were not.

      g.    In or around February 2022, in response to a notice by HRSA of an audit of OCL's claims of Covid-19 testing, AHMED created fake requisition forms,

and Sirajudeen created fake test results for patients named in the fake requisition forms, for the purpose of submitting to the HRSA auditors.

        h.    AHMED, KHAN and Chaudhry minimized and concealed AHMED's role in submitting false HRSA claims through AHMED's Non-Operational Texas Labs by using the names of KHAN and Chaudhry on documents showing ownership of AHMED's Non-Operational Texas Labs and on bank accounts for AHMED's Non-Operational Texas Labs and omitting AHMED's name from documents and bank accounts for labs that AHMED owned and controlled.

        i.    AHMED further minimized and concealed his role in submitting false HRSA claims by creating a Management Contract dated June 10, 2021, showing Individual E as the manager for AHMED's Non-Operational Texas Labs, including Summer Diagnostic Labs, Apollo Labs, SoftLand Labs, Artemis Labs, and Helios Labs, and then, in response to a grand jury subpoena issued in the investigation of the false HRSA claims, pointed to that Management Contract to claim that Individual E was the person with responsibility, knowledge and information concerning AHMED's Non-Operational Texas Labs, when Individual E never had any management responsibility at any of AHMED's Non-Operational Texas Labs.

        39.    On or about the dates set forth below, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants, as set forth below, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and

28

signals, namely, the transmissions listed below, each such transmission constituting

a separate count:

| Count | Defendants | Approx. Date | Transmission |
|---|---|---|---|
| One | ANOSH AHMED | August 8, 2021 | a wire transmission generated by submission of claim no. CW29380244 from OCL to HRSA for payment in the amount of approximately $164.84, processed through servers located in different states, representing a false claim submitted by OCL for a Covid-19 PCR test purportedly performed on a biological sample claimed to be submitted by Individual L.R. |
| Two | ANOSH AHMED | August 18, 2021 | a wire transmission generated by submission of claim no. CW29380244 from OCL to HRSA for payment in the amount of approximately $123.46, processed through servers located in different states, representing a false claim submitted by OCL for a Covid-19 PCR test purportedly performed on a biological sample claimed to be submitted by Individual C.D. |
| Three | ANOSH AHMED | August 18, 2021 | a wire transmission of approximately $500,000 from an account ending in 4602 held in the name of Chicago Polyclinic LLC at Bank E to an account ending in 9190 held in the name of Westside Pharmacy LLC d/b/a Chicago Polyclinic Operations 3 at Bank B, processed through servers located in different states, which funds represented HRSA proceeds paid for false claims of Covid-19 testing submitted through OCL |

| Count | Defendants | Approx. Date | Transmission |
|-------|-----------|--------------|--------------|
| Four | ANOSH AHMED | August 30, 2021 | a wire transmission generated by submission of claim no. CW95122498 from OCL to HRSA for payment in the amount of approximately $183.51, processed through servers located in different states, representing a false claim submitted by OCL for a Covid-19 PCR test purportedly performed on a biological sample claimed to be submitted by Individual M.G. |
| Five | ANOSH AHMED | September 17, 2021 | a wire transmission of approximately $950,000 from an account ending in 4602 held in the name of Chicago Polyclinic LLC at Bank E to an account ending in 9129 held in the name of Westside Pharmacy LLC d/b/a Chicago Polyclinic Operations 1 at Bank B, processed through servers located in different states, which funds represented HRSA proceeds paid for false claims of Covid-19 testing submitted through OCL |
| Six | ANOSH AHMED | September 24, 2021 | a wire transmission of approximately $875,000 from an account ending in 4602 held in the name of Chicago Polyclinic LLC at Bank E to an account ending in 9161 held in the name of Westside Pharmacy d/b/a Chicago Polyclinic Operations 2 at Bank B, processed through servers located in different states, which funds represented HRSA proceeds paid for false claims of Covid-19 testing submitted through OCL |

| Count | Defendants | Approx. Date | Transmission |
|---|---|---|---|
| Seven | ANOSH AHMED and MAHMOOD SAMI KHAN | November 18, 2021 | a wire transmission generated by submission of claim no. DA83796198 for payment in the amount of $164.84, processed through servers located in different states, representing a false claim submitted by Summer Diagnostic for Covid-19 testing of a biological sample claimed to be submitted by Individual T.D. |
| Eight | ANOSH AHMED and MAHMOOD SAMI KHAN | December 20, 2021 | a wire transmission of approximately $2,893,271 from Bank F to Bank A, processed through servers located in different states, which funds represented HRSA proceeds paid for false claims of Covid-19 testing submitted by Summer Diagnostic |
| Nine | ANOSH AHMED | March 21, 2022 | a wire transmission generated by submission of claim no. DG38994436 from a claims processer for HRSA to Bank F for payment in the amount of $164.84, processed through servers located in different states, representing a false claim of Covid-19 testing submitted through Lab A |
| Ten | ANOSH AHMED | March 22, 2022 | a wire transmission generated by submission of claim no. DG44729485 for payment in the amount of $164.84, processed through servers located in different states, representing a false claim of Covid-19 testing submitted through Lab A |

31

| Count | Defendants | Approx. Date | Transmission |
|---|---|---|---|
| Eleven | ANOSH AHMED and MAHMOOD SAMI KHAN | March 23, 2022 | a wire transmission generated by submission of claim no. DG51167118 for payment in the amount of $158.83, processed through servers located in different states, representing a false claim submitted by Apollo Labs for Covid-19 testing  of a biological sample claimed to be taken from Z.S. |
| Twelve | ANOSH AHMED | March 24, 2022 | a wire transmission generated by submission of claim no. DG57052251 for payment in the amount of $158.53, processed through servers located in different states, representing a false claim submitted by SoftLand Labs for Covid-19 testing  of a biological sample claimed to be taken from N.S. |
| Thirteen | ANOSH AHMED and MAHMOOD SAMI KHAN | May 5, 2022 | a wire transmission of approximately $2,263,168 from Bank F to Bank A, processed through servers located in different states, which funds represented HRSA proceeds paid for false claims of Covid-19 testing submitted by Apollo Labs |
| Fourteen | ANOSH AHMED | May 5, 2022 | a wire transmission of approximately $3,251,250 from Bank F to Bank A account ending in 6385, processed through servers located in different states, which funds represented HRSA proceeds paid for false claims of Covid-19 testing submitted by SoftLand Labs |

In violation of Title 18, United States Code, Section 1343.

## COUNT FIFTEEN

The SPECIAL JUNE 2024 GRAND JURY further charges that:

1.      The allegations of paragraphs 1.a. through 1.s., 7 through 9, 13, 14, 16.a. through 16.e., 19, and 38.a. through 38.f. of Counts One through Fourteen are incorporated here.

2.      Beginning in or around June 2021, and continuing through in or around September 2021, in the Northern District of Illinois, Eastern Division, and elsewhere,

ANOSH AHMED

defendant herein, and Mohammed Sirajudeen aka "Siraj," and others known and unknown to the Grand Jury, did knowingly conspire with each other to commit certain offenses against the United States, that is:

a.      to knowingly and willfully solicit and receive from Sirajudeen, on behalf of OCL, remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for AHMED, purportedly on behalf of Westside Pharmacy and Hospital A, ordering, and arranging for ordering from OCL Covid-19 testing services and items for which payment may be made in whole or in part under a Federal health care program, that is, the HRSA Program, in violation Title 42, United States Code, Section 1320a-7b(b)(1)(B); and,

b.      to knowingly and willfully offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind from Sirajudeen, on behalf of OCL, to AHMED, to induce AHMED, purportedly on behalf of Westside Pharmacy and Hospital A, to order, and arrange for ordering from

OCL Covid-19 testing services and items for which payment may be made in whole or in part under a Federal health care program, that is, the HRSA Program, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B).

Purpose of the Conspiracy

3.     It was a purpose of the conspiracy for AHMED and Sirajudeen to unlawfully enrich themselves by: (1) offering, paying, soliciting, and/or receiving kickbacks and bribes from Sirajudeen, through OCL and Chicago Polyclinic, to AHMED, directly and through entities he controlled, to induce AHMED, purportedly on behalf of Westside Pharmacy and Hospital A, to order and arrange for the ordering of Covid-19 testing services from OCL, and in return for such orders; (2) submitting and causing the submission of claims to the HRSA Program for Covid-19 tests ordered by AHMED as a result of the payment of kickbacks and bribes; and (3) sharing the proceeds of the HRSA claims secured by the kickbacks and bribes for the personal use and benefit of AHMED, Sirajudeen and their co-conspirators.

Manner and Means of the Conspiracy

4.     It was part of the conspiracy that AHMED and Sirajudeen devised and participated in the conspiracy to pay and receive illegal kickbacks and bribes from OCL to AHMED in exchange for AHMED, purportedly on behalf of Westside Pharmacy and Hospital A, ordering Covid-19 tests at OCL for the purpose of billing those Covid-19 tests to the HRSA Program.

5.     It was further part of the conspiracy that, from approximately June 2021 through approximately October 2021, OCL caused approximately $642 million in

34

claims for Covid-19 tests to be submitted to HRSA based upon the orders submitted by AHMED, and HRSA paid OCL a total of at least approximately $201 million based on those claims.

6.     It was further part of the conspiracy that AHMED and Siraj disguised the kickbacks and bribes as lawful fees paid by Sirajudeen to AHMED for ordering Covid-19 tests, by, among other things:

a.     entering into the June 4, 2021 agreement between Sirajudeen, as the manager of OCL, and AHMED, on behalf of Westside Pharmacy, wherein OCL would pay a fee to Westside Pharmacy for Covid-19 tests conducted by OCL on biological specimens purportedly collected by Hospital A and sent to OCL for Covid-19 PCR, antibody, and/or antigen tests, and, further, OCL would submit claims for such tests to HRSA for payment; and

b.     increasing the kickbacks and bribes paid by Sirajudeen to AHMED, by increasing the fees paid by Sirajudeen for each Covid-19 test AHMED caused to be ordered from OCL on specimens purportedly collected by AHMED, without revising the terms of the written contract, in order to conceal the increased amount of the kickbacks and bribes paid by Sirajudeen to AHMED.

7.     It was further part of the conspiracy that, from June 2021 through approximately October 2021, Sirajudeen paid, and AHMED received, the kickbacks and bribes, by providing funds from bank accounts controlled by Sirajudeen and held in the names of OCL or Chicago Polyclinic to bank accounts controlled by AHMED and held in the names of Anosh Ahmed, Global Healthcare, Westside Pharmacy, and

in each of AHMED's Chicago Polyclinic DBAs, with the payments sent to each account as directed by AHMED, for a total of approximately $147,091,992 in kickbacks and bribes paid by Sirajudeen to AHMED.

8.     It was further part of the conspiracy that Sirajudeen, AHMED, and others misrepresented, concealed, hid, and caused to be misrepresented, concealed and hidden, the purpose of the conspiracy and acts done in furtherance of the conspiracy, including the acts of concealment described more specifically in paragraphs 38.a. through 38.f. of Counts One through Fourteen.

<u>Overt Acts</u>

9.     In furtherance of and to effect the objects of the conspiracy, Sirajudeen and AHMED committed and caused to be committed the following overt acts, among others, in the Northern District of Illinois, Eastern Division, and elsewhere:

a.     Sirajudeen caused kickbacks and bribes to be paid to AHMED from bank accounts controlled by Sirajudeen, and AHMED received kickbacks and bribes from Sirajudeen in bank accounts controlled by AHMED, on the dates and in the approximate amounts set forth below:

| No. | Approx. Date of Payment | Approx. Amount of Payment | Payor Entity on Account | Payee Entity on Account |
|---|---|---|---|---|
| i. | July 13, 2021 | $1,250,000 | OCL | Westside Pharmacy |
| ii. | July 13, 2021 | $1,250,000 | OCL | Global Healthcare |
| ii. | August 18, 2021 | $500,0000 | Chicago Polyclinic | Westside Pharmacy d/b/a Chicago Polyclinic Operations 3 |
| iii. | August 20, 2021 | $750,000 | OCL | Anosh Ahmed |
| iv. | September 17, 2021 | $950,000 | Chicago Polyclinic | Westside Pharmacy d/b/a Chicago Polyclinic Operations 1 |

36

| No. | Approx. Date of Payment | Approx. Amount of Payment | Payor Entity on Account | Payee Entity on Account |
|---|---|---|---|---|
| v. | September 17, 2021 | $875,000 | Chicago Polyclinic | Westside Pharmacy d/b/a Chicago Polyclinic Operations 2 |

All in violation of Title 18, United States Code, Section 371.

## COUNTS SIXTEEN and SEVENTEEN

The SPECIAL JUNE 2024 GRAND JURY further charges that:

1.      The allegations of paragraphs 1.a. through 1.s., 7 through 9, 13, 14, 16.a. through 16.e., 19, and 38.a. through 38.f. of Counts One through Fourteen are incorporated here.

2.      On or about the dates set forth below, in the Northern District of Illinois, Eastern Division and elsewhere,

ANOSH AHMED,

defendant herein, knowingly and willfully solicited and received remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, as specifically set forth below, from Sirajudeen, on behalf of OCL, in return for AHMED, purportedly on behalf of Westside Pharmacy and Hospital A, ordering and arranging for ordering from OCL Covid-19 testing services and items for which payment may be made in whole and in part under a Federal health care program, that is, the HRSA Program:

| Count | Date of Payment/ Receipt | Approximate Amount of Payment | Payor Entity | Payee Entity |
|---|---|---|---|---|
| Sixteen | July 13, 2021 | $1,250,000 | OCL | Global Healthcare |
| Seventeen | August 20, 2021 | $750,000 | OCL | Anosh Ahmed |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B).

## COUNT EIGHTEEN

The SPECIAL JUNE 2024 GRAND JURY further charges that:

1.     The allegations of paragraphs 1 through 37 of Counts One through Fourteen are incorporated here.

2.     On or about April 14, 2021, in the Northern District of Illinois, Eastern Division, and elsewhere,

ANOSH AHMED,

defendant herein, together with others known and unknown to the Grand Jury, without authorization, and with intent to transfer and use individually identifiable health information for commercial advantage and personal gain, knowingly obtained individually identifiable health information relating to an individual, namely, patients of Hospital A, which information was maintained by a covered entity, as defined in Title 42, United States Code, Section 1320d-9(b)(3), namely, Hospital A;

In violation of Title 42, United States Code, Sections 1320d-6(a)(2) and (b)(3).

39

## COUNT NINETEEN

The SPECIAL JUNE 2024 GRAND JURY further charges that:

1.      The allegations of paragraphs 1 through 38 of Counts One through Fourteen and paragraphs 1 through 9 of Count Fifteen are incorporated here.

2.      Beginning in or around August 2021, and continuing through in or around January 2023, in the Northern District of Illinois, Eastern Division and elsewhere,

ANOSH AHMED,<br>
MAHMOOD SAMI KHAN, aka "Sami," and<br>
SUHAIB AHMAD CHAUDHRY,

defendants herein, together with Mohamed Sirajudeen ("Siraj"), and others known and unknown to the Grand Jury, did knowingly conspire with each other and with others known and unknown to the Grand Jury, to:

a.      knowingly conduct a financial transaction affecting interstate and foreign commerce involving proceeds of a specified unlawful activity, namely wire fraud and violations of the Anti-Kickback Statute, knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and control of proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.      knowingly engage in a monetary transaction in criminally derived property of a value greater than $10,000, which property is derived from

40

specified unlawful activity, namely wire fraud and violations of the Anti-Kickback Statute, knowing that the transaction involved criminally derived property, in violation of Title 18, United States Code, Section 1957;

In violation of Title 18, United States Code, Section 1956(h).

## COUNTS TWENTY THROUGH TWENTY-FOUR

The SPECIAL JUNE 2024 GRAND JURY further charges that:

1.      The allegations of paragraphs 1 through 38 of Counts One through Fourteen and paragraphs 1 through 9 of Count Fifteen are incorporated here.

2.      On or about the dates set forth below, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants, as set forth below, knowingly conducted and attempted to conduct a financial transaction, listed below, namely, the transfer of United States currency from one bank account to another bank account, in or affecting interstate and foreign commerce, each such financial transaction constituting a separate count, which financial transaction involved the proceeds of a specified unlawful activity, namely, wire fraud and violations of the Anti-Kickback Statute, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, and that while conducting such financial transaction, the named defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity:

| Count | Defendant | Date | Financial Transaction |
|---|---|---|---|
| Twenty | ANOSH AHMED | August 12, 2021 | A transfer of $4,100,000 from an account in the name of Westside Pharmacy ending in 2567 at Bank B to an account in the name of Gold Oak Capital ending in 8845 at Bank B |

| Count | Defendant | Date | Financial Transaction |
|---|---|---|---|
| Twenty-One | ANOSH AHMED | September 3, 2021 | a transfer of approximately $1,400,000 from an account in the name of Westside Pharmacy dba Chicago Polyclinic Operations 3 ending in 9190 at Bank B to an account in the name of Westside Pharmacy ending in 2567 at Bank B |
| Twenty-Two | ANOSH AHMED | September 3, 2021 | a transfer of approximately $1,700,000 from an account in the name of Westside Pharmacy dba Chicago Polyclinic Operations 2 ending in 9161 at Bank B to an account in the name of Westside Pharmacy ending in 2567 at Bank B |
| Twenty-Three | MOHAMED SIRAJUDEEN aka "SIRAJ" | September 3, 2021 | a transfer of approximately $675,000 from an account in the name of OCL ending in 6732 at Bank A to an account in the name of B2B Global USA Inc. ending in 0387 at Bank G |
| Twenty-Four | ANOSH AHMED | September 8, 2021 | a transfer of approximately $1,800,000 from an account in the name of Westside Pharmacy dba Chicago Polyclinic Operations 1 ending in 9129 at Bank B to an account in the name of Westside Pharmacy ending in 2567 at Bank B |

In violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## **FORFEITURE ALLEGATION**

The SPECIAL JUNE 2024 GRAND JURY further alleges:

1.      Upon conviction of an offense in violation of Title 18, United States Code, Section 1343, as set forth in this Indictment, defendants shall forfeit to the United States of America any property, real and personal, which constitutes and is derived from proceeds traceable to the offense, as provided in Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

2.      Upon conviction of an offense in violation of Title 42, United States Code, Section 1320(a)-7b(b)(1)(B), and conspiring to violate Title 42, United States Code, Sections 1320(a)-7b(b)(1)(B) and (b)(2)(B), in violation of Title 18, United States Code, Section 371, as set forth in this Indictment, defendants shall forfeit to the United States of America any property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, as provided in Title 18, United States Code, Section 982(a)(7).

3.      Upon conviction of an offense in violation of Title 18, United States Code, Section 1956, as set forth in this Indictment, defendants shall forfeit to the United States of America any property, real and personal, involved in such offense, and any property traceable to such property, as provided in Title 18, United States Code, Section 982(a)(1).

4.      The property to be forfeited includes, but is not limited to:

a.      A personal money judgment;;

b.      Funds not exceeding $50,500,000 in an Account Number ending in held in the name of AHMED at Merrill Lynch, seized on or about December 7,

44

2023;

c.      Class B limited partnership interests of Ashcroft Value-Add Fund II, LP initially purchased for $35 million by GOC Ashcroft Fund, LLC, seized on or about December 7, 2023;

d.      Securities, interests, and funds not to exceed $6,475,000, held by Ashcroft Value Fund or Ashcroft Value Add Fund as an investment of Anosh Ahmed or Gold Oak Capital, Inc., seized on or about December 22, 2023;

e.      Securities, interests, and funds not to exceed $8,250,000, invested by Anosh Ahmed and held in the name of GOC Ashcroft Fund, LLC., in a fund operated by Ashcroft Capital under the name Elliot Pioneer Borrower, LLC, seized on or about May 10, 2024;

f.      2020 Rolls Royce Phantom, VIN: SCATT6C06LU201876, seized on or about August 9, 2023;

g.      2022 Rolls Royce, VIN: SCATV0C07NU209818;

h.      2021 Mercedes-Benz G-Class, VIN: W1NYC7HJ5MX407124;

i.      2020 Lamborghini Huracan EV VIN: ZHWUF5ZF3LLA15156;

j.      Real property commonly known as 6010 Inwood Drive, Houston, Texas. Legally described as follows:

LOT 4, BLOCK 1, WESTHAVEN ESTATES, SECTION 2 PARTIAL REPLAT NO.8 AMENDING PLAT NO. 1, A SUBDIVISION IN HARRIS COUNTY, TEXAS ACCORDING TO THE MAP OR PLAT THEREOF RECORDED IN FILM CODE NO. 685562, OF THE MAP AND/OR PLAT RECORDS, HARRIS COUNTY, TEXAS;

k.      Real property commonly known as 6012 Inwood Drive, Houston, Texas. Legally described as follows:

LOT 3, BLOCK 1, WESTHAVEN ESTATES, SECTION 2 PARTIAL REPLAT NO.8 AMENDING PLAT NO. 1, A SUBDIVISION IN HARRIS COUNTY, TEXAS ACCORDING TO THE MAP OR PLAT THEREOF RECORDED IN FILM CODE NO. 685562, OF THE MAP AND/OR PLAT RECORDS, HARRIS COUNTY, TEXAS;

l.      Real property commonly known as 6016 Inwood Drive, Houston,

Texas. Legally described as follows:

> LOT 1, BLOCK 1, WESTHAVEN ESTATES, SECTION 2 PARTIAL REPLAT NO.8 AMENDING PLAT NO. 1, A SUBDIVISION IN HARRIS COUNTY, TEXAS ACCORDING TO THE MAP OR PLAT THEREOF RECORDED IN FILM CODE NO. 685562, OF THE MAP AND/OR PLAT RECORDS, HARRIS COUNTY, TEXAS;

m.    Real property commonly known as 15 Stillforest Drive, Houston, Texas 77024. Legally described as follows:

> BEING ALL OF LOTS 26 (0.9255 ACRE, 40,314 SQUARE FEET), OF THE STILLFOREST SUBDIVISION, AN UNRECORDED SUBDIVISION IN HARRIS COUNTY, TEXAS, SAVE AND EXCEPT A 20 FOOT RIGHT-OF-WAY DEDICATION, FILED FOR RECORD IN VOLUME 1706, PAGE 673 OF THE DEED RECORDS OF HARRIS COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

> COMMENCING AT A FOUND I-INCH IRON PIPE. SAID PIPE BEING LOCATED IN THE EAST RIGHT -OF-WAY LINE OF STILLFOREST STREET (40 FOOT RIGHT-OF-WAY), SAID POINT ALSO BEING THE NORTHWEST CORNER OF LOT 10;

> THENCE S 01°02' 53" E ALONG THE EAST RIGHT-OF -WAY LINE OF STILLFOREST STREET A DISTANCE OF 808.65 FEET TO A POINT FOR THE NORTHWEST CORNER OF LOT 26 AND THE POINT OF BEGINNING BEING THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT FROM WHICH A 5/8-INCH IRON ROD FOUND BEARS N 17° 30' 09" W A DISTANCE OF 0.26 FEET;

> THENCE N 89° 15' 28" E, WITH THE COMMON LINE OF LOT 22 AND LOT 26, A DISTANCE OF 200.30 FEET TO A POINT FOR CORNER, BEING THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT, FROM WHICH A WOOD FENCE POST BEARS S 37° 00' 10" W, A DISTANCE OF 0.5 FEET;

> THENCE S 01° 46' 53" E, WITH THE COMMON LINE OF LOT 27 AND LOT 26, A DISTANCE OF 200.02 FEET, TO A POINT FOR CORNER, BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT, FROM WHICH A WOOD FENCE POST BEARS N 27° 59' 49" E, A DISTANCE OF 1.75 FEET, ALSO, FROM WHICH A PINCHED TOP IRON PIPE FOUND AT THE EAST COMMON CORNER OF LOT 23 AND LOT 27 BEARS N 89° 15' 28" E, 196.40 FEET AND N 0l° 59'

16" W, 199.76 FEET, ALSO FROM WHICH AN IRON ROD WITH CAP FOUND AT PC OF A CURVE IN THE WEST BOUNDARY LINE OF EAST STILLFOREST STREET BEARS N 89° 15' 28" E, 196.40 FEET AND S 01° 59' 16" E, 161.07 FEET;

THENCE S 89° 15' 28" W, WITH THE COMMON LINE OF LOT 30 AND LOT 26, A DISTANCE OF 202.86 FEET, TO A FOUND 5/8-INCH IRON ROD, HELD FOR THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE N 0l° 02' 53" W, WITH THE EAST LINE OF STILLFOREST STREET, A DISTANCE OF 200.00 FEET TO THE POINT OF BEGINNING, CONTAINING 0.9255 ACRE, (40,314 SQUARE FEET) OF LAND, MORE OR LESS;

5.      If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code, Section 853(p).


A TRUE BILL:

_____
FOREPERSON


/s Michelle Petersen          for ASB
UNITED STATES ATTORNEY


/s Lorinda Laryea/CTS
LORINDA LARYEA
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE