FILED

AUG 05 2026

Judge Sharon Johnson Coleman
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MOHAMED SIRAJUDEEN,
aka "SIRAJ"

No. 25 CR 321

Hon. Sharon Johnson Coleman

## PLEA AGREEMENT

1. This Plea Agreement between the United States Attorney for the Northern District of Illinois, ANDREW S. BOUTROS, and defendant MOHAMED SIRAJUDEEN, also known as "SIRAJ," and his attorneys, DANIEL J. COLLINS and STEPHEN CHAHN LEE, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The parties to this Agreement have agreed upon the following:

### Charge in This Case

2. Count One of the superseding information in this case charges defendant with conspiracy to offer and pay healthcare kickbacks, solicit and receive healthcare kickbacks, and defraud the United States, in violation of Title 18, United States Code, Section 371.

3. Defendant has read the charge against him contained in the superseding information, and that charge has been fully explained to him by his attorney.

4. Defendant fully understands the nature and elements of the crime with which he has been charged.

## Charge to Which Defendant Is Pleading Guilty

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count One of the superseding information, which charges defendant with conspiracy to offer and pay healthcare kickbacks, solicit and receive healthcare kickbacks, and defraud the United States, in violation of Title 18, United States Code, Section 371. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

## Factual Basis

6.     Defendant will plead guilty because he is in fact guilty of the charge contained in the superseding information. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guideline § 1B1.3, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

Beginning no later than June 2021 and continuing until at least October 2021, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant MOHAMED SIRAJUDEEN, also known as "SIRAJ," conspired with Anosh Ahmed ("Ahmed") to: (a) knowingly and willfully offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind from SIRAJ, on behalf of O'Hare Clinical Lab Services, Inc. ("OCL"), to Ahmed, to induce Ahmed and entities controlled by Ahmed, including Westside Pharmacy, LLC, to order and arrange for the ordering from OCL of Covid-19 testing services and items

2

for which payment may be made in whole and in part under a Federal health care program, that is, a Health Resources and Services Administration ("HRSA") program providing reimbursement for diagnostic testing and treating uninsured individuals ("the HRSA Uninsured Program"), in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B), and (b) knowingly and willfully solicit and receive from SIRAJ, on behalf of OCL, remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for Ahmed and entities controlled by Ahmed, including Westside Pharmacy, LLC, ordering and arranging for ordering from OCL Covid-19 testing services and items for which payment may be made in whole and in part by a Federal health care program, namely the HRSA Uninsured Program, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B); and (c) defraud the United States, all in violation of Title 18, United States Code, Section 371.

More specifically, SIRAJ owned and operated Chicago Polyclinic LLC ("CPC"), located in Chicago, Illinois, which managed OCL, a laboratory located in Chicago, Illinois. From November 2020 through September 2022, SIRAJ also was a beneficial owner of OCL, though SIRAJ did not update OCL's registration with HRSA and Medicare regarding his involvement, including the true ownership and control of OCL, until on or about February 18, 2022.

Ahmed was an individual who purported to be affiliated with Hospital A, located on the West Side of Chicago, and to operate Covid-19 test collection sites on

3

behalf of Hospital A in Illinois, Texas, and other states. Westside Pharmacy, LLC was a limited liability company organized in Wyoming, which was controlled by Ahmed.

HRSA was an agency of the U.S. Department of Health and Human Services ("HHS") that oversaw and administered funds appropriated through federal legislation to cover the costs of Covid-19 testing for individuals without health insurance coverage. The HRSA Uninsured Program was a Federal health care program, as defined by Title 42, United States Code, Section 1320a-7b(f). During the Covid-19 public health emergency, HHS Office of Inspector General guidance permitted laboratories to pay retail pharmacies to cover the fair market value of costs associated with collecting Covid-19 testing specimens. Medicare set $23.46 as the nominal specimen collection fee for Covid-19 testing for homebound and non-hospital inpatients.

In early June 2021, Ahmed, on behalf of Westside Pharmacy, approached OCL and offered to bring samples to OCL that Ahmed and his entities purportedly had collected. Ahmed said that he had been sending samples to another laboratory and offered to send the samples to OCL. On or about June 4, 2021, SIRAJ, on behalf of OCL, entered into a contract with Ahmed, on behalf of Westside Pharmacy, pursuant to which Ahmed and Westside Pharmacy agreed to provide Covid-19 test specimens to OCL in exchange for payments from OCL. SIRAJ agreed to pay Ahmed $37.50 for each order for a polymerase chain reaction ("PCR") test that Ahmed arranged to be sent to OCL and $6 per antigen or antibody test that Ahmed claimed to be conducting

4

on behalf of OCL at the time Ahmed purportedly collected the PCR specimens. SIRAJ believed that the amount Ahmed requested above $23.46 was consistent with what another laboratory had paid Ahmed.

Beginning on or about June 21, 2021, Ahmed said that he wanted to be paid $45 per PCR order that Ahmed arranged to send to OCL and $21 for each of the antigen or antibody test specimens purportedly collected at Ahmed's collection sites. SIRAJ understood that Ahmed would stop sending samples to OCL if he did not agree to pay the higher rates, and he knew that paying the higher rates would violate the Anti-Kickback Statute. SIRAJ was concerned about losing the samples and agreed to pay the higher rates that Ahmed had requested to induce Ahmed to order and arrange for the ordering of PCR testing services at OCL instead of another laboratory. SIRAJ and Ahmed did not revise the written contract between OCL and Ahmed to reflect the increased payment to which they had orally agreed in order to further conceal the illegal kickback arrangement. In addition, at Ahmed's insistence, SIRAJ agreed to calculate the amount OCL owed Ahmed based on spreadsheets of patient information Ahmed caused to be sent to OCL. At this time, SIRAJ believed that Ahmed was demanding payment for many PCR samples that Ahmed did not send to OCL and that OCL would not bill for, and he understood that paying Ahmed for such samples would violate the Anti-Kickback Statute. Even so, SIRAJ understood that Ahmed would take his samples elsewhere if SIRAJ did not agree to this arrangement and agreed to make payments to Ahmed in this way.

5

In total, from in or around June 2021, through in or around October 2021, SIRAJ caused OCL and CPC to make approximately $147 million in payments to Ahmed and his entities. SIRAJ provided the payments to induce Ahmed and entities controlled by Ahmed to order and arrange for the ordering of PCR testing services at OCL, and Ahmed accepted the payments in return for ordering and arranging for the ordering of PCR testing services at OCL. Some of these payments were made in the form of checks written to the entities "Chicago Polyclinic Operations 1," "Chicago Polyclinic Operations 2," and "Chicago Polyclinic Operations 3," which were purported entities for which Ahmed had opened bank accounts. SIRAJ acknowledges that the value of the claims paid by HRSA based on samples and data that Ahmed sent to OCL because of such payments is more than $150 million.

For example, in exchange for Ahmed ordering and arranging for orders of Covid-19 testing at OCL, on or about August 28, 2021, SIRAJ directed OCL Associate A to transfer funds from OCL Account No. x6732 to Westside Pharmacy LLC DBA Chicago Polyclinic Operations 1 Bank of America Bank Account No. x9129 in the amount of $925,000; to Westside Pharmacy LLC DBA CPC Operations 2 Bank of America Bank Account No. x9161 in the amount of $900,000; and to Westside Pharmacy LLC DBA Chicago Polyclinic Operations 3 Bank of America Bank Account No. x9190 in the amount of $875,000, all of which were deposited on or about August 30, 2021. SIRAJ also sent payments to Ahmed's personal bank account and to a bank account in the name of another entity controlled by Ahmed, which was not a party to

6

or referred to in the June 4, 2021 Agreement. SIRAJ believed and acknowledges that Ahmed was the signatory on each of the accounts into which these funds were transferred, including Bank of America Bank Account Nos. x9129, x9161, and x9190.

Beginning in or around June 2021, Ahmed provided and caused to be provided to OCL spreadsheets reflecting the names and dates of birth of individuals for whom Ahmed's collection sites had purportedly collected test specimens for purposes of PCR testing ("PCR samples"). The spreadsheets also indicated whether an antigen or antibody test had been conducted for the individuals listed on the spreadsheet at the time the collection site purportedly had collected the PCR samples from the individuals.

Prior to July 6, 2021, OCL's external biller ("Biller A") had received information from OCL to be used to bill HRSA for PCR tests only by: (1) directly accessing OCL's laboratory information system ("LIS") to identify completed tests; or (2) receiving a spreadsheet of completed tests generated from OCL's LIS.

SIRAJ acknowledges that on or about July 6, 2021, SIRAJ arranged for Ahmed and others working for Ahmed to transmit the spreadsheets reflecting the PCR samples purportedly collected by Ahmed's sites, along with the antibody and antigen testing information, directly to Biller A. At the time, SIRAJ and Ahmed knew that Ahmed was sending PCR samples to OCL for only a portion of the individuals included on the spreadsheets.

No later than on or about July 24, 2021, SIRAJ became aware that Biller A had begun submitting claims to HRSA on behalf of OCL for all of the PCR, antigen, and antibody tests reflected on the spreadsheets transmitted by Ahmed, even though, as SIRAJ knew, OCL had not conducted many of the PCR tests reflected on the spreadsheets. By no later than on or about July 24, 2021, SIRAJ was aware that OCL was receiving payments from HRSA in amounts that exceeded what would be consistent with OCL's testing capacity at the time.

Thereafter, SIRAJ knew that the process he had implemented allowed Ahmed and others working for Ahmed to continue to transmit the spreadsheets directly to Biller A and knew that Biller A would continue to submit claims to HRSA on behalf of OCL for PCR tests that SIRAJ knew had not been conducted. From on or about July 24, 2021, through on or about September 7, 2021, SIRAJ caused OCL to submit fraudulent claims to HRSA seeking approximately $238 million for PCR tests, many of which SIRAJ knew had not been completed, resulting in greater than approximately $65 million in fraudulently obtained payments to OCL.

In addition, from August 2021 to September 2021, OCL submitted another $185 million in claims for PCR tests that were never performed, but for which HRSA did not ultimately reimburse OCL due to a HRSA payment suspension that occurred in early September 2021 due to an unrelated issue. Ahmed stopped sending PCR samples and data to OCL once HRSA stopped paying OCL.

8

In furtherance of the conspiracy, SIRAJ caused the electronic transmission to HRSA of numerous lists of testing services purportedly performed by OCL for purposes of fraudulently billing HRSA for those services. For example, on or about August 8, 2021, SIRAJ and Ahmed knowingly caused the submission of claim no. CW29380244 from OCL to HRSA for payment in the amount of approximately $164.84 representing a false claim submitted by OCL for a Covid-19 PCR test purportedly performed on a biological sample claimed to be submitted by Individual L.R.

In or around February 2022, Ahmed approached SIRAJ about fabricating records that would make it appear that Ahmed and his entities had not been paid on a per-sample basis. SIRAJ understood that Ahmed was concerned about being prosecuted for violating the Anti-Kickback Statute and wanted to create fake documentation, and SIRAJ agreed to assist Ahmed.

As part of this agreement, in or around February 2022, Ahmed created a fake, backdated "Management Services Agreement," purportedly dated June 10, 2021, between CPC and a company identified as "Capstone Houston d/b/a Chicago Polyclinic Operations 1, Chicago Polyclinic Operations 2, Chicago Polyclinic Operations 3." SIRAJ signed the fake, backdated agreement on behalf of CPC and Ahmed signed on behalf of "Capstone Houston d/b/a Chicago Polyclinic Operations 1, Chicago Polyclinic Operations 2, Chicago Polyclinic Operations 3." At the time SIRAJ signed the fake, backdated contract, SIRAJ knew that neither OCL nor CPC had ever

9

received any services from Capstone Houston, "Chicago Polyclinic 1," "Chicago Polyclinic 2," or "Chicago Polyclinic 3."

Ahmed also requested information from OCL that he intended to use to create fake invoices, and SIRAJ provided such information knowing the intended purpose. Ahmed and SIRAJ thus caused to be created a series of fake, backdated invoices purportedly sent from "Chicago Polyclinic 1," "Chicago Polyclinic 2," and "Chicago Polyclinic 3" purporting to show that payments from OCL and CPC to Ahmed bank accounts in those names were for various goods and services, including personal protective equipment ("PPE"), IT services, hardware management, patient portal management, electronic medical record ("EMR") integration, revenue cycle management, eligibility verification, coding, denial analysis, provider credentialing, and contract negotiation, when, as SIRAJ and Ahmed knew, the payments were illegal kickbacks and no such goods or services were ever provided by Ahmed or his entities to OCL or CPC.

In February 2022, Ahmed also asked SIRAJ to sign a security note that falsely made it appear that some of the payments that OCL had made to Ahmed himself were connected to a loan in October 2021. SIRAJ agreed to do so. When the false security note was filed with the Cook County Recorder of Deeds in May 2022, Ahmed sent messages to SIRAJ acknowledging that the document was false and asking SIRAJ to take down the document. SIRAJ did not comply with Ahmed's requests.

Additionally, in or around February 2022, SIRAJ learned that HRSA had submitted an audit request to OCL seeking requisition forms, test results, and other

10

records relating to approximately 354 claims that OCL had submitted to HRSA in 2021, approximately 297 of which were attributable to Ahmed. When SIRAJ received the audit request, SIRAJ knew many of the claims for which HRSA requested documents related to orders for PCR testing that had been arranged by Ahmed, which comprised at least approximately 83% of all claims OCL submitted to HRSA. SIRAJ also knew many of the test results requested by HRSA did not exist because OCL had not in fact conducted the tests as represented in the claims to HRSA. SIRAJ further knew that, although required to do so under OCL policies and procedures, Ahmed had not provided requisition forms for any of the orders contained in the spreadsheets transmitted to OCL.

Rather than admit to HRSA that OCL did not have the documents necessary to support its claims, SIRAJ directed one or more OCL employees to affix to the requisition forms furnished by Ahmed OCL sticker labels bearing unique ID numbers associated with fake test results generated in the OCL LIS, all to create the false appearance that the requisition forms and PCR specimens had in fact been received and processed prior to the submission of the claims to HRSA. SIRAJ then transmitted the stickers and the requisition forms bearing the newly printed sticker labels to OCL's outside counsel for the purpose of responding to the HRSA audit, without disclosing that many of the forms were fake and that the sticker labels had only recently been printed and affixed to the requisition forms.

11

SIRAJ ultimately did not submit any of the falsified documents to HRSA in response to the audit request. In or around April 2022, SIRAJ, through his outside counsel, informed the government about the falsified documents that Ahmed and his colleagues had created. SIRAJ acknowledges that he initially denied his involvement in the creation of false forms and only acknowledged this in the course of subsequent discussions with the government.

7.    Defendant, for purposes of computing his sentence under Guideline § 1B1.2, stipulates to having committed the following additional offense(s):

On or about October 17, 2022, in the Northern District of Illinois, Eastern Division, and elsewhere, SIRAJ willfully made and subscribed, and caused to be made and subscribed, a U.S. Individual Income Tax Return (Form 1040 with schedules and attachments), for the calendar year 2021, which return was verified by written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which return he did not believe to be true and correct as to every material matter, in that said return reported on Line 9 that the total income was a loss of $267,171, when defendant knew that his total income substantially exceeded that amount, in violation of Title 26, United States Code, Section 7206(1).

More specifically, on September 14, 2022, prior to the filing of defendant's individual income tax return, Accountant 1 sent an email to SIRAJ that included profit and loss ("P&L") statements for CPC and O'Hare. The CPC P&L statement listed approximately $43,834,036.83 in deductible expenses, based in part on

12

approximately $24,420,068.50 in deductions for payments of collection fees to Ahmed's entities, which resulted in a net income of approximately $31,348,330. On September 15, 2022, Accountant 1 emailed SIRAJ confirming these calculations and stated that CPC's net income of approximately $31,348,330 could not be further reduced.

That same day, on or about September 15, 2022, Siraj caused CPC to file its 2021 Form 1065 U.S. Return of Partnership Income ("Form 1065") with the Internal Revenue Service, in which CPC reported on line 22 an ordinary business income (loss) of $5,299,739, rather than ordinary business income of $31,348,330 identified by Accountant 1 in the P&L statement. The loss reported on the Form 1065 was false. After learning of his potential tax liability based upon the P&L statement, SIRAJ caused Tax Return Preparer 1 and Accountant 1 to include an additional $39,565,076 in collection fees still owed to Ahmed as an accrued expense, even though SIRAJ knew these additional fees were not expenses he intended to pay at that time. The total amount of deductible collection fees listed on the return, $76,586,154, included the $39,565,076 in purportedly Ahmed-related fees. SIRAJ reported deductions of $39,565,076 on the CPC Form 1065 to reduce his taxable income, avoiding tax liability related to income he received from causing the submission of false claims to the HRSA Program related to tests purportedly collected by Ahmed. The Schedules K-1 corresponding to the Form 1065 identified SIRAJ as a 96% owner of CPC.

13

On or about October 17, 2022, SIRAJ filed his Form 1040 U.S. Individual Income Tax Return ("Form 1040") for tax year 2021, in which he reported a loss of $5,087,749, as previously reflected in Line 1 of the CPC Schedule K-1 for SIRAJ. This amount was SIRAJ's 96% ownership share of the $5,299,739 loss falsely reported on the CPC Form 1065. This claimed loss ultimately resulted in SIRAJ falsely claiming a loss of $267,171 on his Form 1040, line 9, representing total income. SIRAJ knew when he submitted the Form 1040 that the false loss of $5,087,749, which he used to calculate a false total income amount of negative $267,171, was based on false deductions from the CPC Form 1065 for tax year 2021.

The stipulated offense and related conduct resulted in a federal tax loss of approximately $~~13,255,358~~ 12,096,643 and a state tax loss of approximately $~~525,147~~ 1,653.862, for a total tax loss of approximately $13,750,505. *DV ЪM vMS*

8.    The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and criminal forfeiture and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

### Maximum Statutory Penalties

9.    Defendant understands that the charge to which he is pleading guilty

carries the following statutory penalties:

      a.     A maximum sentence of 5 years' imprisonment. This offense also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

      b.     Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court. The Court also may order restitution to any persons as agreed by the parties.

      c.     Pursuant to Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty or restitution imposed.

### Sentencing Guidelines Calculations

10.    Defendant understands that, in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training,

15

medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

11. For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a. **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the 2025 Guidelines Manual.

b. **Offense Level Calculations**.

Count One

i. Pursuant to Guideline § 2B4.1(a), the base offense level is 8.

ii. The offense level is increased by 26 levels, pursuant to Guideline §§ 2B4.1(b)(1)(B) and 2B1.1(b)(1)(N), because the value of the improper benefit conferred from the kickbacks was more than $150 million but not more than $250 million.

iii. Pursuant to Guideline § 3C1.1, the offense level is increased by 2 levels because SIRAJ willfully obstructed or impeded, or attempted to

16

obstruct or impede, the administration of justice with respect to the investigation of the instant offense.

iv.      The total offense level for Count One, therefore, is 36.

Stipulated Offense

v.       The base offense level is 26, pursuant to Guideline §§ 2T1.1(a)(1) and 2T4.1(K), because the tax loss of $13,750,505 is more than $9,500,000 but less than $25,000,000.

vi.      The offense level is increased by two levels, pursuant to § 2T1.1(b)(1), because SIRAJ failed to report and to correctly identify the source of income exceeding $10,000 in any year from criminal activity.

vii.     The total offense level for the stipulated offense, therefore, is 28.

Grouping

viii.    Pursuant to U.S.S.G. § 3D1.2, Count One and the stipulated offense do not group.

ix.      The group with the highest offense level is Count One, with an offense level of 36.

x.       Pursuant to Guideline § 3D1.4, because the offense level for the stipulated offense is 8 levels less serious than Count One, the stipulated offense is counted as one-half unit and the offense level for Count One is counted as

17

one unit, for a total of one and one-half units. As a result, pursuant to Guideline § 3D1.4, the offense level is increased by 1 level.

xi. The government understands that defendant will truthfully admit the conduct comprising the offense(s) of conviction, and truthfully admit or not falsely deny any additional relevant conduct for which the defendant is accountable under Guideline § 1B1.3. Therefore, based upon facts now known to the government, defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office for the Northern District of Illinois and the Probation Office with all requested financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

xii. In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

18

xiii.    Based on the facts now known to the government, defendant does not receive any criminal history points from Chapter Four, Part A, and otherwise meets the criteria set forth in Guideline § 4C1.1(a). Therefore, the offense level is decreased by 2 levels.

c.    **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

d.    **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 32 which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 121 to 151 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose. However, the statutory maximum sentence for this offense is 60 months' imprisonment so, pursuant to Guideline § 5G1.1(a), the advisory guideline range is 60 months' imprisonment.

12.    Defendant and his attorney and the government acknowledge that the guidelines calculations set forth in this Agreement are preliminary in nature and are non-binding predictions upon which neither party is entitled to rely. Defendant understands the above calculations are based on information now known to the government and that further review of the facts or applicable legal principles may

19

lead the government to change its position on the Guidelines calculations. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the defendant's, the probation officer's, or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of a change in the government's position on the guideline calculations or the Court's rejection of these calculations.

13. The government agrees that it will refrain from taking a position on the sentence that should be imposed and the parties agree this Agreement is therefore governed by Fed. R. Crim. P. 11(c)(1)(B). Both parties expressly acknowledge that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors by a statement to the Probation Office or the Court, setting forth any changes in either parties' position regarding the guidelines calculations. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections. While the government will take no position on the sentence to be imposed, the parties acknowledge that the government shall endeavor to ensure that the relevant facts and sentencing factors, as applied to the facts, are brought to the District Court's attention fully and accurately, including facts related to the

20

defendant's criminal conduct and related conduct, and any relevant information concerning the defendant's background, character, and conduct that the District Court may consider under 18 U.S.C. § 3661 in imposing a sentence.

### Cooperation

14. Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the U.S. Department of Justice, Criminal Division or the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

### Agreements Relating to Sentencing

15. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation and shall take no position on the sentence that should be imposed. Defendant shall be free to recommend any sentence.

16. It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the defendant, defendant will have no right to withdraw his guilty plea.

21

## Restitution

17.     Defendant agrees to pay restitution pursuant to the following terms.

18.     **Restitution to the U.S. Department of Health and Human Services.** Regarding restitution, defendant agrees to pay, together with any jointly liable co-defendants, restitution to the U.S. Department of Health and Human Services, arising from the relevant conduct described above, in the amount of $78,593,590, minus any credit for funds repaid prior to sentencing, pursuant to Title 18, United States Code, Sections 3663(a)(3) and 3664.

19.     **Restitution to the United States Treasury and the Illinois Department of Revenue.** Defendant agrees to pay restitution to the United States Treasury arising from the stipulated offense and related conduct set forth above, totaling $~~13,255,858~~ 12,096,643 for tax year 2021, and to the Illinois Department of Revenue, totaling $~~525,147~~ 1,653,862 for tax year 2021, pursuant to Title 18, United States Code, Sections 3663(a)(3) and 3664. Defendant understands that the amount of tax loss as calculated by the Internal Revenue Service and the Illinois Department of Revenue may exceed the amount of tax due as calculated for restitution in this criminal case.



a.      Defendant further acknowledges that the IRS may use the amount of restitution ordered as the basis for a civil assessment under 26 U.S.C. § 6201(a)(4). Defendant does not have the right to challenge the amount of this restitution-based assessment. *See* 26 U.S.C. § 6201(a)(4)(C). Neither the existence of a restitution payment schedule nor defendant's timely payment of restitution

22

according to that schedule will preclude the IRS from immediately collecting the full amount of any assessment.

b. Defendant is entitled to receive credit for restitution paid pursuant to this plea agreement against those assessed civil tax liabilities due and owing for the same periods for which restitution was ordered. Defendant understands and agrees that the plea agreement does not resolve the defendant's civil tax liabilities, that the IRS may seek additional taxes, interest, and penalties from defendant relating to the conduct covered by this plea agreement, and that satisfaction of the restitution debt does not settle, satisfy, or compromise defendant's obligation to pay any remaining civil tax liabilities.

20. Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office for the Northern District of Illinois of any material change in economic circumstances that might affect his ability to pay restitution.

21. Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

22. Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), and Title 31, United States Code, Sections 3711,

23

3716, and 3728, notwithstanding any payment schedule set by the Court. In the event of the death or dissolution of, or the government's inability to locate the named recipient(s) of restitution in the Judgment and Commitment Order, the defendant agrees to not oppose efforts by the government to obtain an order substituting as payee a representative of the victim's estate, another family member, or any other person or successor entity appointed as suitable by the court, or the Crime Victims Fund.

### Forfeiture

23. Defendant understands that, by pleading guilty, he will subject to forfeiture to the United States all right, title, and interest that he has in any property, real or personal, involved in the offense, and any property traceable to such property.

24. Defendant agrees to forfeiture of the following specific property to the United States:

a. Funds in the amount of $3,800,298.27 from Millennium Bank Account x4602 in the name of Chicago Polyclinic LLC and Mohamed S Sirajudeen, seized on or about January 31, 2022.

b. Real property commonly known as 401 N. Wabash Avenue, Unit 43A, Chicago, Illinois, 60604. Legally described as follows:

PARCEL 1:

UNITS 43A, P103 AND P157 IN THE 401 NORTH WABASH AVENUE RESIDENTIAL CONOMINIUM AS DELINEATED ON A SURVEY OF THE FOLLOWING DESCRIBED REAL ESTATE:

PART OF LOT 1 IN TRUMP TOWER SUBDIVISION OF A TRACT OF

24

LAND IN SECTION 10, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN.

WHICH SURVEY IS ATTACHED AS EXHIBIT "A" TO THE DECLARATION OF CONDOMINIUM RECORDED AS DOCUMENT NUMBER 0821716050. TOGETHER WITH ITS UNDIVIDED PERCENTAGE INTEREST IN THE COMMON ELEMENTS, ALL IN COOK COUNTY, ILLINOIS.

PARCEL 2:

NON-EXCLUSIVE EASEMENTS FOR INGRESS, EGRESS, SUPPORT, USE AND ENJOYMENT AS CREATED BY AND SET FORTH IN THE DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS AND EASEMENTS FOR THE 401 NORTH WABASH BUILDING RECORDED AS DOCUMENT NUMBER 0803015062, AS AMENDED BY SPECIA; AMENDMENT, RECORDED AUGUST 4, 2008 AS DOCUMENT 0821716049.

PARCEL 3:

A NON-EXCLUSIVE EASEMENT IN FAVOR OF PARCELS 1 AND 2, AS GRANTED IN THAT CERTAIN ORDINANCE BY THE CITY OF CHICAGO APPROVED OCTOBER 1, 2004 AND RECORDED JANUARY 3, 2005 AS DOCUMENT NUMBER 0500319078 AS PUBLISHED IN JOURNAL PAGES 30411 TO 30458, BOTH INCLUSIVE, FOR THE IMPROVEMENT, USE AND MAINTENANCE OF PUBLIC WAY, TO IMPROVE, MAINTAIN, REPAIR, REPLACE, USE AND OCCUPY FOR PEDESTRIAN PURPOSES, AND NOT VEHICULAR PURPOSES, CERTAIN TRACTS OF LAND AS MORE PARTICULARLY DESCRIBED THEREIN.

PARCEL 4:

THE EXCLUSIVE RIGHT TO THE USE OF S-2321, A LIMITED COMMON ELEMENT AS DELINEATED ON THE SURVEY ATTACHED TO THE DECLARATION AFORESAID RECORDED AS DOCUMENT NUMBER 0821716050.

c.     In doing so, defendant admits that the funds and property described above represent proceeds defendant obtained as a result of the offense, as

25

alleged in the superseding information. Defendant consents to the immediate entry of a preliminary order of forfeiture as to this property, thereby extinguishing any right, title, or interest defendant has in it. If any of the specific property is not yet in the custody of the United States, defendant agrees to seizure of that property so that it may be disposed of according to law.

25.     Defendant understands that forfeiture shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment. In this case, however, the United States Attorney's Office for the Northern District of Illinois will recommend to the Attorney General that any net proceeds derived from any forfeited assets be remitted or restored to eligible victims of the offense pursuant to Title 18, United States Code, Section 981(e), Title 28, Code of Federal Regulations, Part 9, and other applicable law.

26.     Defendant agrees to waive all constitutional, statutory, and equitable challenges in any manner, including but not limited to direct appeal or a motion brought under Title 28, United States Code, Section 2255, to any forfeiture carried out in accordance with this agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel.

26

27. After sentence has been imposed on the court to which the defendant pleads guilty as agreed herein, the government will move to dismiss Count 23 of the indictment.

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

28. This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney's Office for the Northern District of Illinois and defendant regarding defendant's criminal liability in case 25 CR 321.

29. This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois, and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

30. Defendant understands that nothing in this Agreement shall limit the Internal Revenue Service in its collection of any taxes, interest or penalties from defendant and his spouse or defendant's partnership or corporations.

27

## Waiver of Rights

31.     Defendant understands that, by pleading guilty, he surrenders certain rights, including the following:

a.     **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charge against him, and if he does, he would have the right to a public and speedy trial.

i.     The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.     If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

28

iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.     At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

viii.     With respect to forfeiture, defendant understands that if the case were tried before a jury, he would have a right to retain the jury to determine whether the government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

29

b.      **Waiver of appellate and collateral rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Agreement. In addition, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

32.     Defendant understands that, by pleading guilty, he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

33.     Defendant understands that the United States Attorney's Office for the Northern District of Illinois, in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall endeavor to ensure that the relevant facts and sentencing factors, as applied to the facts, are brought to the District Court's attention fully and accurately, including facts related to the defendant's criminal conduct and related conduct, and any relevant information concerning the defendant's background, character, and conduct that the District Court may consider under 18 U.S.C. § 3661 in imposing a sentence.

34.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office for the Northern District of Illinois regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be

31

prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

35. For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office for the Northern District of Illinois of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

### Other Terms

36. Defendant agrees to cooperate with the United States Attorney's Office for the Northern District of Illinois in collecting any ordered fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

37. Regarding matters relating to the Internal Revenue Service, defendant agrees as follows (nothing in this paragraph, however, precludes defendant and his

32

spouse or defendant's partnerships or corporations from asserting any legal or factual defense to taxes, interest, and penalties that may be assessed by the IRS):

   a. Defendant agrees to cooperate with the Internal Revenue Service in any tax examination or audit of defendant and his spouse and defendant's partnerships or corporations which directly or indirectly relates to or arises out of the course of conduct that defendant has acknowledged in this Agreement, by transmitting to the IRS original records or copies thereof, and any additional books and records that the IRS may request.

   38. Defendant will not object to a motion brought by the United States Attorney's Office for the Northern District of Illinois for the entry of an order authorizing disclosure of documents, testimony and related investigative materials which may constitute grand jury material, preliminary to or in connection with any judicial proceeding, pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i). In addition, defendant will not object to the government's solicitation of consent from third parties who provided records or other materials to the grand jury pursuant to grand jury subpoenas, to turn those materials over to the Civil Division of the U.S. Department of Justice, or an appropriate federal or state agency (including but not limited to the Internal Revenue Service), for use in civil or administrative proceedings or investigations, rather than returning them to the third parties for later summons or subpoena in connection with a civil or administrative proceeding involving, or investigation of, defendant and his spouse or defendant's partnerships or

33

corporations. Nothing in this paragraph or the preceding paragraph precludes defendant and his spouse or defendant's partnerships or corporations from asserting any legal or factual defense to taxes, interest, and penalties that may be assessed by the IRS.

39.     Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## Conclusion

40.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

41.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on

34

the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

42.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

43.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

44.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _August 4, 2026_

/s/ Patrick Mott
PATRICK MOTT
For the United States Attorney

MOHAMED SIRAJ
Defendant

KELLY GUZMAN
DIANE MacARTHUR
Assistant United States Attorneys

DANIEL J. COLLINS
STEPHEN CHAHN LEE
Attorneys for Defendant

35